IN THE UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

        Plaintiff,

vs.                                               No. 1:11-CV-845-JCH/LFG

704 HTL OPERATING, LLC, and
INVESTMENT CORPORATION OF
AMERICA d/b/a MCM ELEGANTE HOTEL,

        Defendants.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on the parties' cross-motions for summary judgment on the issue of integrated enterprise (Docs. 81, 90).  In the underlying action, Plaintiff Equal Employment Opportunity Commission ("EEOC") brings a Title VII suit for religious discrimination and retaliation on behalf of charging party Safia Abullah, who contends that she was wrongfully terminated by Defendants after declining to remove her *hijab*, the traditional headscarf worn by Muslim women.  On the instant motions, Plaintiff seeks a summary judgment that Defendants are an "integrated enterprise," such that Defendant Investment Corporation of America ("ICA") is responsible for the actions of its investment entity, Defendant 704 HTL Operating, LLC ("704-ABQ"), with respect to Abdullah; Defendants seek a summary judgment that they are neither an integrated enterprise nor a joint employer.  The Court, having considered the motions, briefs, exhibits, and the relevant law, and being otherwise fully informed, finds that a material factual dispute exists as to the instant issue, and, consequently, that both parties' motions should be denied.

## FACTUAL BACKGROUND

### Defendant ICA's Ownership Interests and Governing Officers

Defendant Investment Corporation of America ("ICA") is a 26-employee, Odessa, Texas-based investment company, with interests in a wide variety of business entities, all of which are separate legal entities.  ICA's investment interests include all eight MCM Elegante Hotels, which are located throughout Albuquerque, New Mexico; Colorado; and Texas.

ICA is 84% owned by the C & J Revocable Trust and 16% owned by Ed Lasater. C & J Revocable Trust is co-owned by John Bushman, who also serves as ICA's Chairman.  Lasater serves as ICA's President; perhaps redundantly, he is also President of ICA's hotels division.

In addition to owner/officers Bushman and Lasater, other ICA officers include: VP of Finance Christopher Rose, Secretary Sherry D. Snodgrass, Assistant Secretary Joan Bishop; and Monty Pulliam, who serves as Senior Vice-President of Hotels.

### ICA's Ownership Percentage of MCM Elegante Hotels, Including 704-ABQ

Defendant 704 HTL Operating, LLC (hereinafter, "704-ABQ") does business under the trade name of the "MCM Elegante Hotel of Albuquerque."  ICA maintains a 90% ownership in 704-ABQ (the remaining 10% is owned by an entity referred to in the record as "the ICA Group, Inc.").  ICA's ownership interest in the other seven MCM Elegante Hotels is as follows:

> 90% ownership of four hotels ( "304 Hotel Operating," "904 Hotel Operating," "1204 Hotel Operating," and "1211 Operating");
>
> 75% ownership of two hotels ("607 Hotel Operating" and "807 Hotel Operating");
>
> 29.5% of one hotel (referred to only as "HTL Operating").

### Employment Numbers for 704-ABQ

As of December 31, 2011, 704-ABQ employed eighty-five (85) full-time and nine part-

2

time employees.

## **Overlap in Officers Between ICA, 704-ABQ, and the Other MCM-Elegante Hotels**

A number of ICA officers serve in the same positions for 704-ABQ, including Bushman (Chairman), Lasater (President), Rose (VP of Finance), Snodgress (Secretary), Bishop (Assistant Secretary).  These officers also serve as five of the seven Managers for 704-ABQ.  The other two Managers are Roy Allen, Cynthia Fresquez, and John C. Nichols.

The managers of 304 Hotel Operating are the same as for HTL Operating.

The managers of 904 HTL Operating are the same as for 704-ABQ except for the deletion of Cynthia Fresquez and the addition of Monty Pulliam and Bill Bianchi.

The managers of 1204 Hotel Operating are the same for 704-ABQ except for the deletion of Cynthia Fresquez and the addition of Jo Ann Schibi.

The managers of 607 Operating are the same for 704-ABQ except for the deletion of Cynthia Fresquez and addition of Lamar Vines.

The managers of 807 Hotel Operating are the same for 704-ABQ except for the deletion of Cynthia Fresquez and addition of Perry Hughes.

 The managers of 1211 Hotel Operating are the same for 704-ABQ except for the deletion of Cynthia Fresquez and addition of Misuk Ko.

All the Hotel Operating entities have the same Registered Agent- John C. Nichols.

General Managers of the MCM Elegante Hotels do not have an ownership interest in them.

In total, the eight MCM Elegante Hotels employ an estimated 600-700 people.

3

**ICA's Management Services at the MCM Elegante Hotels**

ICA charges each of the eight MCM Elegante Hotels a management fee for services provided by ICA.  ICA Senior VP Pulliam, who also serves as Manager of each of the eight hotels, testified at his deposition that ICA's management role consists of overseeing hotel operations – which he defined as "consult[ing]" with each hotel's general manager and "various people" employed there and providing unspecified assistance to them.  (Doc. 20 Ex. A Pulliam Dep. at 20:1-20:23).

**Finance and Accounting**

ICA's Accounting Department prepares financial statements for each of the MCM Elegante Hotels.

ICA prepares the tax returns for each hotel, based on information provided by that hotel.  Individual hotels pay their own taxes.

Each of the MCM Elegante Hotels pays its own bills, but has its accounting functions performed by Venita Yelley, ICA's Vice President of Operations.  Yelley prepares monthly financial statements for each hotel, which are reviewed by Pulliam and Lasater of ICA.

ICA occasionally audits the equipment at each hotel, and audits the payroll to make sure the hours and pay are accurate.

ICA has made loans to 704-ABQ.

**Shared Website, Logos, and Equipment**

MCM Elegante hotels share a common website (mcmelegante.com) in addition to their individual websites.  The hotels further maintain a second shared website from which employees can download forms needed for Human Resources purposes.

Each hotel bears an identical logo.  Further, each MCM Elegante Hotel displays a

4

concrete block etched with the Ten Commandments.

ICA does not have a common bank account with any of the hotels.

**Common Operations Among MCM Elegante Hotels**

Some advertising for individual MCM Elegante hotels lists more than just one MCM Elegante Hotel location in order to show that the hotel is part of a larger chain.  However, each hotel pays for its own advertising.

The hotels do not share a common 1 (800) telephone number.

At least one former Human Resources Manager at 704-ABQ had a practice of providing new employees with a booklet that listed the various entities owned by ICA, in order to demonstrate that the employees were part of a larger structure and a larger entity.

In employment-related documents, ICA describes itself as "Investment Corporation of America (the Company)," "Investment Corporation of America or any of its affiliated companies," and "Investment Corporation of America (and all affiliated companies)."

All eight MCM Elegante Hotels share an Information Technology specialist.

ICA holds quarterly meetings to discuss performance and profits of its various investment companies, which are open to all employees of those companies, including the MCM Elegante Hotel employees.

**Human Resources**

Prospective employees of all MCM Elegante Hotels are subject to background and credit checks, for which ICA – specifically, ICA's  Human Resource Manager Tanya Cooper -- assumes responsibility.  In the event that a check reflects a negative issue in an applicant's history, Cooper or her assistant, Tammie Cree, will provide a recommendation as to the applicant's hireability, and the hotel can take the issue up "to [ICA President] Ed Lasater if they

wanted to override that."  (Doc. 82 Ex. B Cooper Dep. at 27:10-27:12).

Cooper further testified that Lasater would "generally review" the hiring needs at each hotel, but wouldn't "necessarily sign off on each" individual hiring request.  *Id*. at 114:9-114:11.

Lasater approves raises in salary for employees at 704-ABQ.

ICA has 401(K) and health insurance plans that all MCM Elegante Hotels employees qualify to participate in, as well as a dental insurance plan for qualifying employees. ICA's Human Resources department in Odessa, Texas maintains all the personnel files for all employees of all the MCM Elegante hotels; and, further, maintains and stores insurance, medical and 401(K) enrollment forms, background checks, credit checks, notices of employee injury, and requests relating to hiring at the hotels.

ICA pays for employee drug testing and credit and background checks and then seeks reimbursement from its investment entities.  Similarly, the costs for MCM Elegante employees to participate in ICA's profit-sharing and health care plans are paid for by the hotel at which the individual is employed.

There is one standard Application for Employment common to all ICA-owned companies, including the MCM Elegante Hotels.  Human Resources forms and policies – including a safety policy, post-accident drug and alcohol testing policy, vacation policy, workers' compensation form, a sexual harassment policy, an EEO data collection form, direct deposit form, wage deduction authorization agreement and computer and internet policy – are identical for each of the MCM Elegante Hotels, and all are identified as ICA documents.  ICA HR Department

Employees may transfer from one hotel property to another, with the approval of the General Managers involved.

6

### ICA Involvement in Tenure of 704-ABQ Employee Luanne Slough

ICA had knowledge that Luanne Slough – the 704-ABQ employee whose alleged role in the termination of Safia Abdullah is at the heart of this case -- was employed as HR Manager at the hotel.  Slough was eventually terminated by ICA's SVP Pulliam, who advised ICA President Ed Lasater about the termination.  Following her termination, Slough made a claim of unemployment to ICA HR Manager Cooper.

## LEGAL STANDARD

### Summary Judgment[1]

Rule 56(c) of the Federal Rules of Civil Procedure requires that summary judgment be rendered "where no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law."  *Hackworth v. Progressive Cas. Ins. Co.*, 468 F.3d 722, 725 (10th Cir. 2006); *see also* Fed. R Civ. P. 56(c)(2).  The moving party bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation and marks omitted).  Once this burden has been met, "the burden shifts to the nonmoving party to show that there is a genuine issue of material fact.  The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's

---

[1]While the rule in the Tenth Circuit is that "the 'single employer' or 'integrated-enterprise' test is a jurisdictional matter that must be resolved under *Fed. R. Civ. P. 12(b)(1)*, where, as here, there is no dispute that the employer falls within the statutory definition of 'employer' under Title VII, "then the issue is one for summary judgment disposition."  *Spicer v. RadNet, Inc.*, 2010 U.S. Dist. LEXIS 134712,*4-*5 (D. Kan., Dec. 20, 2010) (citations omitted); see also 42 U.S.C. § 2000e(b) (defining "employer" as "a person engaged in an industry affecting commerce who has 15 or more employees . . . . ").

favor." *Id. See also Clifton v. Craig,* 924 F.2d 182, 183 (10th Cir. 1993).  It is not enough for the

nonmoving party to "rest on mere allegations or denials of his pleadings" to avoid summary

judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *see also West v. New*

*Mexico Taxation and Rev. Dept*., No. Civ. 09-0631, U.S. Dist. LEXIS 131626, at *42 (D.N.M.,

Oct. 31, 2010) ("[n]or can a party avoid summary judgment by repeating conclusory opinions,

allegations unsupported by specific facts, or speculation") (internal quotation and marks

omitted). In reviewing a motion for summary judgment, the court must "examine the factual

record and draw reasonable inferences therefrom in the light most favorable to the nonmoving

party."  *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1184 (10th Cir.

2010).  Its function at this stage is "not . . . to weigh the evidence and determine the truth of the

matter, but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 243.


## DISCUSSION

In its Complaint, Plaintiff claims that ICA and the MCM Elegante Hotels, including 704-

ABQ,  are "an integrated enterprise and/or joint employer that failed to hire Safia Abdullah

and/or hired and then discharged Ms. Abdullah," for purposes of determining the applicable

damages cap in this case. (Doc.1 Cplt. ¶ 6); *see also* 42 U.S.C. § 1981a(b)(3)(D) (providing

damages cap of $300,000 "in the case of a respondent who has more than 500 employees in each

of 20 or more calendar weeks in the current or preceding calendar year," in actions for

employment discrimination brought under the Civil Rights Act of 1991)  Plaintiff now moves

for entry of a partial summary judgment that Defendants, together with the seven other MCM

Elegante Hotels, are a "single employer" or "integrated enterprise,"; in the alternative, Plaintiff

seeks a summary judgment that Defendants are a "joint employer," so that ICA is vicariously

liable for the discriminatory acts of 704-ABQ.  Defendants seek a summary judgment that they are not a single or joint employer.

A.      **Single-Employer Analysis**

The Tenth Circuit employs the single-employer test to determine "whether two nominally separate entities should in fact be treated as an integrated enterprise."  *Bristol v. Bd. of Cnty. Comm'rs,* 312 F.3d 1213, 1218 (10th Cir. 2002) (en banc). "Courts applying the single-employer test generally weigh four factors: (1) interrelations of operation; (2) common management; (3) centralized control of labor relations; and (4) common ownership and financial control." *Id.* at 1220 (internal quotation marks omitted): *see also Lockard v. Pizza Hut, Inc*., 162 F.3d 1062, 1069-70 (10th Cir. 1998) (applying single-employer test in Title VII case).   The first three factors are weighed most heavily. *Rowland,* 272 F. Supp. 2d at 1201.  "The most important inquiry is whether the parties have an arm's length relationship."  *Id.*

"The interrelatedness of [separate] subsidiaries is . . . irrelevant to the interrelation of operations inquiry." *Frank v. U.S.W, Inc.*, 3 F.3d 1357, 1362 (10th Cir. 1993).

**Interrelated Operations**

Courts have considered a number of indicia of interrelatedness in applying the integrated-enterprise test.  Evidence supporting a finding of interrelated operations between a parent and subsidiary has been found to include a showing of  (1) common employees; (2) a shared benefits program; (3) combined accounting records; (4) combined bank accounts; (5) combined lines of credit; (6) combined payroll preparation; (7) combined telephone numbers or switchboards; (8) combined offices or headquarters; and (9) shared services or equipment.  *See Spicer,* 2010 U.S. Dist. LEXIS 134712, at 8; *Rowland,* 272 F. Supp. 2d at 1202.

Plaintiff points to several factors that, it claims, demonstrate that Defendants operate as a

single employer:  ICA HR Manager Cooper and Senior Vice President Pulliam provide human resources and management services, respectively, to all hotels; Ed Lasater is President of both entities; testimonial evidence demonstrates that 704-ABQ provides new employees with a booklet of all ICA entities, so they can understand that the hotel is part of a larger corporate structure; Defendants have one set of forms and policies, applicable to all employees; the same insurance benefits are available to employees of ICA and employees of the MCM Elegante Hotels, provided by one provider, and administered by Cooper; eligible employees of all entities can participate in ICA's 401(k) plan; ICA holds quarterly meetings which all employees of the hotels and its other investment entities are invited to attend, at which the performance and profitability of the entities is discussed; and Lasater and Pulliam review monthly financial statements for, and generally oversee, all hotels.[2]

Defendants cite the following reasons why ICA and 704-ABQ do not operate interrelatedly: "[w]hile ICA administers payroll and benefit programs for its subsidiaries, it does not control" these operations, but merely processes checks and other paperwork (Doc. 90 at 8); 704-ABQ pays its own bills; Defendants do not have the same headquarters, and do not share advertising; ICA does not hire, fire, or set salaries of employees at 704-ABQ; and ICA does not share a bank account or telephone number with 704-ABQ, nor do any of the hotels share one.

The Court finds that there is sufficient evidence in the record from which a reasonable

---

[2] Plaintiff also argues that interrelatedness is supported by evidence that: policies and procedures common to all MCM Elegante Hotels refer to ICA "and all its affiliated companies," (*see, e.g.*, Doc. 82 Ex. 9); the hotels maintain a single website for purposes of making online reservations , which depicts them "as one big chain," (Doc. 82 at 17); the hotels share a logo and a common religious presence – a concrete block in which the Ten Commandments are etched; and the hotels have a single IT service provider.  This evidence tends to show the *horizontal* interrelatedness of the MCM Elegante Hotels themselves, rather than the interrelatedness of the two Defendants, which is the only question at issue here.

10

jury could find in favor of either party as to this prong.  There is ample evidence in the record of

common employees of both entities –  including President Lasater, HR Manager Cooper, and

ICA Senior Vice President of Hotels / 704-ABQ Supervising Manager Pulliam, all of whom

have major  roles with both entities.  *Cf. Frank*, 3 F.3d at 1362 (no evidence of interrelation of

operations where "one of parent's employees is an occasional consultant on the [subsidiary's]

project.").  It is also undisputed that ICA controls and administers health insurance and all other

fringe benefits for 704-ABQ employees.  On the other hand, there is no evidence that Defendants

share bank accounts, lines of credit, telephone numbers, or office space; and the parties dispute

the extent to which ICA controls 704-ABQ's payroll and consistently takes a hand in its

employment decisions.

Accordingly, the Court finds the existence of a material factual dispute with regard to the

interrelation prong.

### Common Management

When considering the second factor, common management, a court examines whether

the two entities have common directors or officers involved in the management of personnel.

*Spicer,* 2010 U.S. Dist. LEXIS 134712, at *11.  Courts have found common management in

cases where the two entities have a common president who controls personnel management, as

well as other common officers; where the two entities have the same president, officers, and

directors; and where the same family headed both entities, and consulted frequently as to their

management.  *Frank,* 3 F.3d at 1364 (collecting cases). However, "[o]ne common manager is

insufficient to establish a disputed material fact under this prong of the integrated enterprise

test." *Id.*

In support of summary judgment, Plaintiff again notes that Lasater is President and

11

Cooper is Human Resources Manager of both entities; and that  ICA Senior Vice President

Pulliam makes personnel decisions regarding 704-ABQ in his capacity as Supervising Manager

for the hotel –  including the decision to terminate 704-ABQ employee Luanne Slough.  Further,

Plaintiff notes that a number of ICA officers serve in the same officer positions for 704-ABQ,

including Bushman (Chairman), Lasater (President), Rose (VP of Finance), Snodgress

(Secretary), and Bishop (Assistant Secretary), in addition to serving as Managers of the hotel.

Defendants respond that there is no common management in this case because "ICA is an

investment company, a completely different business from the running of a hotel operation" – a

perfunctory argument that Defendants do not support by additional explanation.  (Doc. 90 at 10).

Next, Defendants note that 704-ABQ has its own General Manager, who is not an ICA

employee.  Third, Defendants contend that many of the ICA employees who serve as Managers

at 704-ABQ – Defendants do not specify which ones – would more accurately be described as

"Directors" of the hotel (Doc.105 at 9) (citing Texas Business Organizations Code, Title 3,

Chapter 101, Sec. 101.002(4) (noting that definition of "director" includes "manager").  Finally,

Defendants contend that Tanya Cooper's status as Human Resources Manager of both entities is

irrelevant because Cooper merely provides administrative support to the hotel.  Defendants do

not challenge Plaintiff's characterization of ICA officer/704-ABQ Supervising Manager as

having supervisory authority over hotel operations.

The Court finds that there can be no material dispute as to whether ICA and 704-ABQ

are commonly managed.  Even accepting Defendants' characterization of several of the ICA

officers/704-ABQ managers as actually directors of the hotel within the meaning of Texas law,

the Tenth Circuit has recognized that two entities are commonly managed where they share the

"same officers and directors, [as well as the ] same president."  *Frank*, 3 F.3d at 1364.

### Centralized Control of Labor Relations

The Tenth Circuit has indicated that whether a parent controls the labor relations of its subsidiary is the "most important factor" to be weighed in the integrated-enterprise analysis. *See Rowland,* 3 F.3d at 1202.  In order to meet this prong, "a parent must control the day-to-day employment decisions of the subsidiary."  *Frank,* 3 F. 3d at 1363.  Courts have found that the prong has been met where a plaintiff has demonstrated that an officer of both the parent and subsidiary approved all of the subsidiary's hiring decisions (*id.*); parent "issued regimented rules regarding employment practices," which the subsidiary was ordered to follow (*id.*); and where the parent "issued personnel policies, paid subsidiary's non-union employees, was listed as employer on the W-2 forms of subsidiary's non-union employees, and terminated a subsidiary employee on one occasion.") (citations omitted).  As the Tenth Circuit has repeatedly directed, "[t]he critical question is, 'what entity made the final decisions regarding employment matters related to the person claiming discrimination?"  *Id.* (quotation omitted).

In support of its motion, Plaintiff asserts a number of facts that, it contends, support a finding that ICA controls the day-to-day employment decisions of 704-ABQ.  Of these facts, the only relevant evidence[3] relates to Cooper's testimony that, pursuant to her duties, she recommends to the hotel not hiring those applicants who perform poorly on their pre-hire

---

[3]For example, Plaintiff argues at length that the control prong is met by evidence that "employee transfers between the MCM Elegante Hotels may occur with the approval of the General Managers involved."  (Doc. 82 at 22).  Such evidence is unhelpful to Plaintiff's case for summary judgment because 1) it asserts that the General Managers of the hotels exert some degree of control over their employees, rather than the total control by ICA required to show "centralized control"; and 2) Plaintiff attempts to rely on cases in which employees were transferred between a parent and subsidiary, rather than between two subsidiaries, as Plaintiff alleges here.

background checks, and that the hotel must appeal to ICA President Lasater in order to override

her "recommendation"; as well as evidence ICA Senior Vice President / 704-ABQ Manager

Pulliam terminated 704-ABQ employee, Luanne Slough.

   In support of their cross-motion, Defendants proffer Cooper's deposition testimony that,

while she received the "pre-hire paperwork" regarding EEOC charging party Safia Abdullah, she

did not know whether 704-ABQ hired Abdullah, and did not know whether Abdullah wore a

hijab.  (Doc. 105 at 13; Ex. 2 Cooper Dep. at 80:7-80:24).  They further point to Slough's

testimony that she "believe[d] it was *after* [Abdullah] had left the hotel to see if she could find

something shorter . . . to wear" that Slough contacted Cooper to confirm that Slough's

interpretation of ICA's safety policy – which, according to Slough, did not allow for the wearing

of a hijab – was correct.  *Id.* Ex. 5 Slough Dep. at 143:16-143:18 (emphasis added).

   The Court finds that neither side has demonstrated that it is entitled to judgment as a

matter of law on the issue of centralized control. While Plaintiff has presented evidence that ICA

will occasionally exert some degree of control over the decision to hire applicants at 704-ABQ –

at least with respect to the narrow scenario in which the decision to hire comes down to the

applicant's performance on a background or credit check, or as demonstrated by evidence that

ICA's Pulliam fired at least one 704-ABQ employee– it has not demonstrated that ICA

consistently exercises day-to-day control over employment decisions at the hotel.  *See Spicer*,

2010 U.S. Dist. 134712 at \*13 ("Day-to-day control must actually be exercised; potential control

is not sufficient.").

   Defendants' evidence similarly fails to settle the Tenth Circuit's "critical question" of

"what entity made the final decisions regarding employment matters related to the person

claiming discrimination?" by showing that the challenged decision was made by employees of

704-ABQ alone.  While Defendants attempt to rely on Cooper's testimony that she never learned whether Abdullah was even hired by 704-ABQ, they simultaneously seek to rely on Slough's contradictory testimony she and Cooper in fact discussed Abdullah, and that Cooper seconded her concern about Abdullah's desire to wear a hijab.  *See* Doc. 105 Ex. 5 Slough Dep. at 145:2-145:4 (testifying that Cooper "said she felt the same way that I did, she was – she was concerned that a loose garment could potentially be a safety issue").  Equally significant is Slough's testimonial evidence that she contacted Cooper "to be clear on the safety policy" that mandated Abdullah remove her scarf in order to perform her duties at the hotel – evidence that, if believed by a jury, suggests ICA policy in fact dictates the personnel decisions of 704-ABQ.  *Id.* at 143:5-143:6; *see also Spicer*, 2010 U.S. Dist. 134712 at *13 ("Courts have found centralized control . . . when the parent has issued personnel policies and also fired at least one employee.").

Accordingly, the Court finds that a material factual dispute as to the control prong.

### Common Ownership or Financial Control

It is undisputed that ICA is owned by three individuals – John and Carol Bushman, and Ed Lasater – and that ICA has 90% ownership interest in 704-ABQ.  Accordingly, the Court agrees with Plaintiff that there are sufficient facts in the record to hold, as matter of law, that Defendants are owned by the same individuals.  *See also* Doc. 105 at 17 (Defendants asserting that they "do not dispute that ICA, as an investment company, has a majority ownership" in 704-ABQ, but arguing that "common ownership is the least important of the [applicable] factors," and a showing of common ownership is "insufficient to justify treating a parent corporation and its subsidiary as a single employer.") (citation omitted).

### Conclusion

The Court finds that a genuine factual dispute exists as to two of the four "integrated

15

enterprise" factors in the instant case, including the "most important factor" of whether ICA controls the labor relations of 704-ABQ.  Accordingly, the parties' cross-motions for summary judgment will be denied.

### B.    Plaintiff's Alternative "Joint Employer" Claim

Plaintiff's Complaint states that, in the event that the Defendant entities are determined not to be an integrated enterprise, the Court should find in the alternative that they were the "joint employer" of EEOC charging party Safia Abdullah.  (Doc. 1 Cplt. ¶ 6).  In a perfunctory and undeveloped section at the closing of their opening brief, Defendants assert that they are entitled to a summary judgment that they were not the joint employer of Abdullah.[4]  (Doc. 90 at 12) (noting that "'courts look to whether both entities exercise significant control over the same employees' to determine whether they are joint employers") (quoting *Sandoval v. Boulder Regional Communications Center*, 388 F. 3d 1312, 1333 (10th Cir. 2004)).  Defendants do not attempt to demonstrate Plaintiff's inability to prove their status as joint employers, instead offering a global cite to their "Proposed Undisputed Material Facts Nos. 6-29" as general support for their position.  *See* Doc. 90 at 13 (further noting, in conclusory fashion, that "there is no evidence or allegation that ICA was involved in personnel decisions that gave rise to this litigation.").  Because Defendants fail to meet their initial burden of showing an absence of evidence to support Plaintiff's "joint employer" claim, this portion of their motion will also be denied.

---

[4]Plaintiff does not seek summary judgment on the "joint employer" issue.

**CONCLUSION**

Therefore, for the reasons set forth above, the Court finds that *Plaintiff EEOC's Partial*

*Motion for Summary Judgment* (Doc. 81) and *Defendant Investment Corporation of America's*

*Motion for Summary Judgment on the Issue of Integrated Enterprise* (Doc. 90) are **DENIED.**


_____
UNITED STATES DISTRICT COURT